**BARNETT et al. v. WEST CONST. CO.**

**No. 7201.**

Circuit Court of Appeals, Fifth Circuit.

March 8, 1934.

Herbert S. Phillips, of Tampa, Fla., for appellants.

A. G. Turner, of Tampa, Fla., and Vaughn Miller, of Chattanooga, Tenn., for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Alleging that sums paid to defendant for income tax purposes, under clause 22[1] of a working agreement they had, had been diverted from that purpose and converted by defendant to its own use, plaintiffs brought this suit for an accounting.

The defense was no diversion. Specifically, it was asserted that the moneys had been received and applied by defendant as agreed, both when the profit sharing contract was made and when, in 1926, all accounts were settled and the net profits distributed. During 1925 and 1926 plaintiffs, as partners, had a unique working agreement in regard to road contracts in Florida, with defendant, a general contractor, doing business in many other places as well. The writing which effected and controlled this arrangement designated it as a "Cooperation." The agreement was not made public. It was not

---

[1] "22. Taxes. State, County, and City taxes in the localities where the Co-operation is operating will be paid by Co-operation. Government income tax will be paid by Co-operation to the Company in accordance with their net income, and the Company will pay this amount to the Government in connection with their tax on their total net income."

known to outsiders. It did not exist as to them. All contracts were taken in defendant's name, all obligations were incurred, all business done in its name. As to the parties to it, it was only a symbol for accounting purposes. By its use, in addition to salaries of $60 per week paid to each of the partners, they were to receive two-thirds of the net profits defendant made out of the contracts it covered. Plaintiffs thus pleaded the effect of the agreement: "Under and by said contract defendant corporation was given the contracting control, the credit control, and the financing control of the business." In fact, however, the agreement gave nothing to the defendant. It was treated by the parties to it as, it was, a profit sharing accounting device by which the plaintiffs, employees of the defendant, got from it two-thirds of the net profits the company made out of that part of its business. A year to year arrangement, it provided in section 23 [2] for discontinuance after thirty days' notice, and the distribution of the net profits, one-third to defendant and two-thirds to plaintiffs. On December 6, 1926, it was discontinued and its net profits were distributed in accordance with the contract. In the course and as a part of the accounting provided for in the contract, and the distribution of profits had at its dissolution, 13½ per cent. of the net income, $119.398.07 for 1925 and $208,682.-23 for 1926 was paid to defendant for income taxes under clause 22. It was as to these payments, $16,118.75 for 1925, and $28,172.-10 for 1926, a total of $44,290.85, that plaintiffs' suit sought an accounting. As to these plaintiffs alleged that they should have been applied, but were not, in exoneration of plaintiffs' tax liability on account of the profits distributed to them. They sought a decree awarding two-thirds of them to plaintiffs.

The District Judge thought absurd the claim plaintiffs put forward, that the moneys paid defendant under section 22 had been paid to them for the purpose of paying the income tax of the co-operation in exoneration of the partnership of Barnett & Embrey, and of its individual members in respect of these earnings. He rejected it altogether. He thought equally absurd defendant's claim that the moneys had been paid to it to pay its own income tax. He found it unnecessary, however, to construe the clause to determine what the parties had originally intended by it, because he found that plaintiffs and defendant had completely settled all matters at issue between them. He found that the accounting and distribution the parties had when in December, 1926, they distributed the net profits operated as a settlement, and resulted in a complete accord and satisfaction.

Plaintiffs vigorously assail the decree as wrong, in the results accomplished and the reasons given. Defendant as vigorously maintains that the decree was right. Plaintiffs urge that their suit is not correctly apprehended if considered as defeated by settlement. They insist that their suit is not in contradiction of, but in accordance with, the agreement to discontinue. They say that they are merely asking that the moneys which were paid the defendant for a purpose, be applied to that purpose. They insist that this in no manner contradicts the agreement for discontinuance, it fully affirms it. They say, in short, that their suit though in form an action for an equitable accounting, is in effect a suit for moneys had and received from plaintiffs for a specific purpose, which, diverted from that purpose by defendant, should be returned to them.

Speaking broadly, we think plaintiffs are right as to the nature of their suit and their rights under it, if they can maintain the proposition they advance. We think they should have the moneys they sue for if in law the defendant has diverted them from the purpose for which they were lodged with it. It becomes necessary, then, to inquire whether defendant is in fact withholding money from the purposes to which, by the agreement under which it got it, it was to be devoted. To determine this requires a construction of the contract, not alone as it was written, but as the parties have interpreted it.

Defendant insisting that the moneys were paid to it to pay its income tax, points out that all of the business was done by it and in its name; all of the profits were earned by it and in its name. All of the property employed in the conduct of the business was owned by it and assessed in its name. All taxes due in connection with the operations were the taxes of the company. It insists

---

[2] "23. Discontinuance. Should the company or the partnership decide to discontinue this cooperative agreement on the thirty days (30) notice given by either or by mutual consent, they shall proceed to complete all contracts in hand at the time, and as rapidly as possible convert the Cooperation's assets into cash, and either sell or divide the equipment. All liabilities will be paid from the proceeds, and the surplus, if any, will be divided in the proportion of one third to the Company and two thirds to the partnership."

that just as the company put aside or set up on its books in respect of· the business, it did elsewhere, in the profits from which Barnett and Embrey · had no share, 13½ per cent. of its income to pay the income tax due on account of it, so here the business in which the co-operation was interested had to contribute to company funds to pay its income tax 13½ per cent. of the net income of the business done before there were any net profits to be distributed under the co-operation agreement.

Plaintiffs say this is not, it cannot be, a fair construction of the contract. That such construction would result in reducing the profits it was agreed Barnett and Embrey should have by the amount of their contribution to defendant's income tax. They say that what was intended by the contract, what it means, is that all taxes accruing as the result of the business· done under the working agreement, whether against the defendant, the co-operation, or Barnett and Embrey, were to be paid out of the profits realized from that business. It is quite clear that the clause under consideration does not in terms say any such thing; it is equally clear, we think, that no reasonable construction of its terms will yield such meaning. At no place in the agreement is any mention made of the payment of Barnett and Embrey's taxes; there is no statement in it that the co-operation would pay taxes to the government. On the contrary, the agreement in terms declares that the co-operation will pay the company, and that the company will pay the government in connection with its income taxes. If then the contract stood for construction without aid from the actions of the parties, we think it would admit of no other meaning than that, by clause 22, the parties intended to make the amounts paid by the co-operation to the company on account of income taxes, a charge against the income before net profits could be distributed to the sharers. We think that by clause 23 they intended to distribute only the net profits thus determined. The other paragraphs of the contract, and the acts of the parties, bear this out. The company agreed to pay and look after the payment of all income taxes which the company, in whose name the business was done, would be put to. It recognized that the profit sharing arrangement it had made with plaintiffs would not save it from accounting to the government as its own, for all income produced by the business done. If the contract· on its face carries the meaning that payments on account

of taxes should be deducted from net income before the profits could be ascertained and distributed, the construction the parties gave to the contract by their actions under it make this meaning stand out more clearly.

■ The contract provided for the payment by the co-operation of state, county, and city taxes. None of these taxes were in fact assessed to or paid by it. They were all assessed to and paid by the company, and their amounts deducted from the income as a co-operation expense. The only point on which the contract is silent is as to the basis for figuring and the amount to be paid on account of income tax. This was supplied by the parties when, by their accounting and in the dissolution agreement, they fixed 13½ per cent. of the net income figured without the deduction, as the basis, and settled and agreed upon $44,290.85 as the amount to be paid. Having agreed that these amounts were proper deductions, plaintiffs may not now complain that they were more than was needed to pay the company's tax. This at last, is what plaintiff's case really comes down to. All else is afterthought advanced first in 1928 when, in an exigent situation because of their personal delinquency, they were seeking to at once explain and excuse their failure to return and pay taxes on their profits. The record will be searched in vain for support of the claim they now advance, that the payment on income tax was made to defendant so that it might pay the tax of the co-operation, or their personal taxes. At the time of the settlement they were greatly concerned and consulted with both West and Lumsden, who made inquiries for them as to the best method of returning their personal taxes so as to avoid or lighten their payments. They made no claim that defendant should pay them, or that the moneys ·deposited with the defendant were to be applied in payment or in diminution of them. The record shows, on the contrary, that these payments were agreed deductions from net income before the division of net profits. They were paid to and received by defendant under clause 22 on account of its having to account for and pay income tax on that net income. West and Lumsden both testified that the December dissolution, in which these deductions now sued for were made, was intended to be and was a complete and final settlement of all matters arising under the contract, and that everything then agreed on has been carried out in full. Both testified that at that time plaintiffs were told that the income tax mon-

eys had not been and were not being paid to the government.

Plaintiffs concede that this is so as to all matters except the income taxes they now sue for, and as to these, they make no case.

Barnett testified as to the December settlement,

"All items and monies that were going to the West Construction Company in the settlement were duly allowed and finally paid to West Construction Company, and all items and allowances and payments that were coming to Barnett and Embrey under that settlement were duly received by us except the income tax. That was not mentioned at that settlement to my recollection."

As to the amounts paid the company on income tax account both plaintiffs admitted that they were agreed on and approved in the dissolution agreement. Lumsden testified flatly that both Barnett and Embrey were told that none of this money had been or was being paid to the government on account of income tax, and that after a full discussion of the matter between all the parties, the entry was O. K.'d.[3]

We think the record leaves in no doubt that the claim plaintiffs now make finds no support either in the contract or in the dealings the parties had under it. It is an afterthought due to two things: One of them is the necessity they found themselves under after their delinquency had been discovered, to explain why they did not make earlier returns of their profits. The other is their feeling that since by charging as part of the expenses of the business the profits Barnett and Embrey got defendant has lightened the income tax it supposed it would have to pay, plaintiffs should have back two-thirds of those savings.

We do not think so. It was not so agreed either in the contract creating or in the agreement dissolving the co-operation. The contract plainly provided the basis for the profit sharing, the dissolution agreement fixed the shares. Plaintiffs have had their shares on the agreed basis. Merely because if they had anticipated what they later found out, they might have agreed differently either in the making or in the dissolution of the con-

tract, they cannot be heard now, while holding to the profits they got on the basis they agreed on, to claim more on some other basis.

We find no fault with the decree. It is affirmed.

---

[3] "Mr. Embrey came into the office during the afternoon while I was down there and asked me if the money the company was getting under this section was being paid to the Government and I told him no. Later in the afternoon Mr. Barnett came into the office, and Mr. Embrey, and says, Charley, Lonnie says that the money they are getting under this Section 22 for income taxes is not being paid to the Government, and there was no more discussion during the afternoon. That evening Mr. West was in the office, and Mr. Barnett and Mr. Embrey and myself, and Mr. Embrey told Mr. West that I had told him we were not paying this money to the Government, and Mr. Embrey and Mr. West discussed the Company getting this money and not paying it to the Government and after the discussion I was told that the entry of $28,000.00 was O. K." Lumsden, Tr. p. 242.